

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **DENNIS O'NEILL,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 05 C 7316 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| **FORD MOTOR COMPANY**, a Corporation, | ) | |
| **ALBERICI CONSTRUCTORS, INC.,** | ) | |
| a Corporation, **LESCO, INC.**, a Corporation, | ) | |
| **LESCO SERVICE, INC.**, a Corporation, | ) | |
| **LESCO DESIGN & MANUFACTURING,** | ) | |
| **LESCO, LESCO SUPPLY CO.,** | ) | |
| **AUTOMATION & CONVEYOR** | ) | |
| **TECHNOLOGY**, a Business unit of | ) | |
| Durr Systems, Inc., a Corporation, f/k/a | ) | |
| Acco Systems, Inc., **ACCO SYSTEMS, INC.,** | ) | |
| **DURR SYSTEMS, INC.,** | ) | |
| **F/K/A ACCO SYSTEMS,** | ) | |
| Tri-Tec LLC, a Limited Liability | ) | |
| Corporation, and **C&C SERVICE**, Individually, | ) | |
| and a Corporation d/b/a C-Logic, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| **DURR SYSTEMS, INC.,** | ) | |
| **F/K/A ACCO SYSTEMS**, and | ) | |
| **Tri-Tec LLC**, a Limited Liability Corporation, | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **ARISTEO CONSTRUCTION COMPANY,** | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Dennis O'Neill ("Plaintiff") sued Ford Motor Company ("Ford"), Alberici Constructors ("Alberici"), Durr Systems ("Durr"),[1] Tri-Tec, LLC ("Tri-Tec"), C & C Service ("C-Logic"), and other defendants (collectively "Defendants") on tort law theories. Defendants Ford, Alberici, Durr, Tri-Tec, and C-Logic each moved for summary judgment. The parties consented to have this Court conduct any and all proceedings in this case, including the entry of final judgment. 28 U.S.C. § 636(c); N.D. Ill. R. 73.1. For the reasons stated below, the Court grants the motions for summary judgment filed by Durr, Tri-Tec, and Alberici; but it denies the motions for summary judgment filed by Ford and C-Logic.

## I. Background

### A. The Project and Contractors at the Ford Plant

Before explaining the facts, the Court apologizes to the reader in advance. The facts in this case are many and complicated–in part because there is a large cast of characters involved, and in part because they are just plain complicated. With that cautionary note, the Court trudges headwind.

The facts are drawn from Defendants' Joint Statement of Facts, Plaintiff's Statement of Additional Facts, and the responses thereto.[2] The relevant facts begin in January 2004, at which

---

[1] Durr was formerly known as Acco. For the purposes of this Opinion, the Court refers to this entity always as Durr.

[2] On September 21, 2009, Plaintiff filed a Motion for Leave to File an Amended Response to Defendants' Joint Rule 56.1 Statement of Material Facts and Plaintiff's Additional Statement of Facts ("Plaintiff's Motion for Leave") (Dckt. 252). This Court denied Plaintiff's

(continued...)

time Ford had begun a project ("the Project" or "the Ford Project") at one of its Assembly Plants located in Chicago, Illinois ("the Ford Plant" or "the Plant"). (Defs.' SOF ¶¶ 1, 4.) To complete the construction at its Plant, Ford contracted Tri-Tec, which provided program management in the form of engineering services (Pl.'s Resp. to Defs.' SOF, Ex. BB), contract services, and project administration services for the Project. (Defs.' SOF ¶ 7).[3] Tri-Tec then subcontracted some of this work to Durr (Defs.' SOF, Ex. BB). Durr supplied and installed conveyors for the Project at the plant. (Defs.' SOF ¶ 6.)

Although the parties initially agree that Aristeo hired Durr to "install a convey[o]r after Aristeo finished building the mezzanine" (Defs.' SOF ¶¶ 5-6), the contract between Aristeo and Durr shows that *Aristeo* was the subcontractor for Durr (Pl.'s Resp. to Defs.' SOF, Ex. AA). Aristeo was responsible for reconfiguring the assembly lines to enable Ford to produce new automobiles. (Defs.' SOF ¶ 5.) As part of its work, Aristeo constructed the mezzanine, which was designed to be a foundation for a new conveyor. (Defs.' SOF ¶ 13.) Aristeo also hired C-Logic as

---

[2](...continued)
Motion for Leave on September 22, 2009. That same day, the Court heard arguments on Defendants' Amended Joint Motion to Strike Plaintiff's Response to Defendants' Joint Rule 56.1 Statement of Facts ("Defendants' Motion to Strike") (Dckt. 246), and took that motion under advisement. Upon further review, the Court finds that the Plaintiff's Amended Response is substantially the same as, but follows N.D. Ill. R. 56.1 more closely than, its original response to Defendants' Statement of Facts. The Court also observes that Defendants responded to Plaintiff's Additional Statement of Facts; therefore, the Defendants do not suffer any prejudice by the Court considering them in this Opinion. For these reasons, the Court vacates its September 22, 2009, Order denying Plaintiff's Motion for Leave and now grants that motion (Dckt. 252). The Court also denies as moot Defendants' Motion to Strike (Dckt. 246).

[3] The parties did an inadequate job explaining where Tri-Tec and Durr fit within the contracting scheme. As best the Court can tell, Tri-Tec was the general contractor hired by Ford, and Tri-Tec then contracted with Durr. But even if these roles were reversed, it makes no difference. Both Tri-Tec and Durr were the two highest contractors in the "contractor chain." Their respective positions as to each other does not affect this Court's decision.

a subcontractor to perform safety management services for it at the Plant. (Defs.' SOF ¶ 9.) In addition to Aristeo, Durr hired Alberici to perform mechanical installation work (i.e., to install a conveyor system) at the Plant.[4] (Defs.' SOF ¶ 5, Ex. O, Brown Aff. 1; Pl.'s Resp. to Defs.' SOF, Ex. P at 3.)

## B.     Facts Relevant to Aristeo's Work and the Contractors' Involvement

Plaintiff worked as a "journeyman ironworker" for Aristeo, which hired him in 2003. (Defs.' SOF ¶¶ 1, 3, 12.) In January of 2004, he worked on the Project at Ford's Plant installing a mezzanine that would serve as the foundation for a new conveyor. (Defs.' SOF ¶ 13.) Plaintiff was trained to use equipment such as a crane, a chain-fall, scaffolding, or a come-along to hoist I-beams into position. (Pl.'s Resp. to Defs.' SOF ¶ 44.) Aristeo supplied all of its ironworkers with their equipment. (Defs.' SOF ¶ 18.) Thus, at the Plant, Aristeo employees had access to and used cranes that were owned and operated by Aristeo. (Pl.'s Resp. to Defs.' SOF ¶ 44.)

While employed at Aristeo, Plaintiff reported to David Wood, Aristeo's superintendent at the Plant ("Aristeo Superintendent Wood" or "Wood"). (Defs.' SOF ¶ 14, Ex. C, O'Neill Dep. 86, April 17, 2008.) Wood stated that he (Wood) reported to Aristeo's project manager, Jim Spryute, who would, in turn, report to Aristeo's general manager, Rick Lawandowski. (Pl.'s Resp. to Defs.' SOF ¶ 14, Ex. G, Wood Dep. 14, May 1, 2008.)

---

[4] Although the parties agree that Durr and Alberici did not have a contractual relationship with one another (Defs.' SOF ¶ 5), they also agree to just the opposite: Durr hired Alberici as a subcontractor (Defs.' SOF ¶ 8). Because a copy of the contract between Durr and Alberici is attached, the Court finds a contractual relationship did exist between these parties. (Pl.'s Resp. to Defs.' SOF, Ex. P at 3.) The citations purporting to show otherwise fail to show no contract existed.

Additionally, Paul Neely and Bill Francisco ("Francisco" or "Aristeo Foreman Francisco"), two Aristeo foremen, supervised the ironworkers and reported to Aristeo Superintendent Wood. (Defs.' SOF ¶ 15.) Wood, Neely, and Francisco received daily instructions from Aristeo, which they issued to the ironworkers. (*Id.* at ¶ 16.) Specifically, Wood gave Plaintiff his assignments every weekday while Francisco gave Plaintiff these assignments on the weekends. (*Id.*) Only Aristeo foremen and the superintendent could give assignments to Plaintiff. (*Id.*)

Foremen shouldered other responsibilities, as well. In particular, Francisco testified that Aristeo gave him instructions about how to do his work. (Defs.' SOF, Ex. E, Francisco Dep. 59-60, Dec. 10, 2008.) Aristeo Superintendent Wood testified that, when ironworkers were faced with a decision whether to use a man-lift to hoist an I-beam, the foreman had initial discretion to make that call. (Defs.' SOF ¶ 17, Ex. G, Wood Dep. 35.) If the foreman had doubts, however, the ironworker could approach Ford or a third-party safety person onsite. (*Id.*) Plaintiff's supervisors provided him with instructions on how to correct improperly performed work. (Defs.' SOF ¶ 22.) Wood also testified that Aristeo set and issued schedules for its ironworkers. (*Id.* at ¶ 17, Ex. G, Wood Dep. 79.)

But Robert Brown, the project manager for Alberici at the Plant ("Brown" or "Alberici Manager Brown"), testified that Melvin Milton–Durr's project superintendent–coordinated and scheduled the work for both Alberici and Aristeo. (Pl.'s Resp. to Defs.' SOF ¶ 19, Ex. V, Brown Dep. 28-32, Aug. 9, 2007.) Brown managed the scope of Alberici's work, controlled the labor it used to build the project, and managed any changes regarding its work that occurred on the project. (Defs.' Resp. to Pl.'s Additional Facts ¶ 2.) Brown observed both Alberici and Aristeo

employees hanging steel on the ceiling and near the trusses on the Ford project. (*Id.* at ¶ 4.) He stated that Alberici employees used deck cranes, chain falls, and a helicopter to accomplish the job. (*Id.*) Brown also testified that he observed Ford employees removing electricians from the site, though his explanation for why Ford removed them–i.e., for improperly using a man-lift–was not based on direct knowledge. (Pl.'s Resp. to Defs.' SOF, Brown Dep. 21-23.) Instead, he said an individual told him that these employees were removed for using a man-lift to hoist materials.[5] (*Id.*, Ex. V, Brown Dep. 23.) Additionally, he claimed that Milton was supervising, observing, or monitoring the work of Aristeo and Alberici, both of which, at one time, worked in the same area. (Pl.'s Resp. to Defs.' SOF ¶ 20, Ex. V, Brown Dep. 32-33.)

Aristeo Superintendent Wood also stated that Durr employees would visit Aristeo's worksite "periodically" and "check for quality," "schedule[,] and progression." (Pl.'s Resp. to Defs.' SOF ¶ 20; Def.'s SOF, Ex. G, Wood Dep. 24-32.) According to Wood, "[Durr employees] would check for the plumbness of our hangers, which supported the steel, and, of course, they would check to make sure that the location was in accordance with the drawings." (Def.'s SOF, Ex. G, Wood Dep. 26.) This "checking" also included consulting with Durr for help in reading and interpreting construction drawings. (Defs.' SOF, Ex. G, Wood Dep. 24.) When asked whether Durr controlled the means and methods of Aristeo's work, Wood said "No." (*Id.*)

Francisco testified that Durr's safety employees had no obligation to interact with Aristeo employees. (Defs.' SOF 17, Ex. E, Francisco Dep. 52.) Plaintiff stated that he never received any instructions from Durr. (Defs.' SOF, Ex. C, O'Neill 115-16, April 17, 2008.) Stephen Polewski, an Aristeo ironworker in January 2004, stated that he had never seen anyone from Durr on the

_____

[5] The Court did not consider this statement, which is hearsay, in reaching its decision.

worksite.[6] (Defs.' SOF, Ex. F, Polewski Dep. 109-110, 112, Feb. 10, 2009.). Furthermore, Durr never provided safety training to Aristeo. (Pl.'s Resp. to Defs.' SOF ¶ 79.)

Durr, though, wasn't the only entity involved in this project. Ford, too, played a role. Aristeo Superintendent Wood testified that Ford Project Supervisor Steve Knaak ("Knaak" or "Ford Supervisor Knaak") would visit Aristeo's worksite from "time to time." (Defs.' SOF ¶ 68, Ex. G, Wood Dep. 50-53.) Wood also stated that Knaak had in the past directed Aristeo employees to change their behavior because they committed "hardhat [and] safety glass infractions." (Id., Ex. G, Wood Dep. 51.) Additionally, he said that when Knaak had safety concerns, Knaak would typically approach him (Wood) or an Aristeo foreman to determine if Aristeo employees could perform a task in an alternative manner. (Id., Ex. G, Wood Dep. 52.)

Plaintiff also testified to similar facts. (Pl.'s Resp. to Def.'s SOF, Ex. Y, O'Neill Dep. 69-70, April 17, 2008.) Plaintiff said that on two occasions Ford Supervisor Knaak approached him, once for reasons related to safety glasses and once for reasons related safety of work on the mezzanine. (Id., Ex. Y, O'Neill Dep. 69-70, April 17, 2008.) As to the latter encounter, Plaintiff stated that it was difficult to get a measurement so he "had to step on the midrail" to do so, and "[Knaak] caught [him] doing that, so [Knaak] told [him] to get down." (Pl.'s Resp. to Def.'s SOF, Ex. Y, O'Neill Dep. 70, April 17, 2008.)

If safety concerns arose, Plaintiff testified that he would raise them with Wood, Francisco, or Neely. (Defs.' SOF 23, Ex. C, O'Neill Dep. 115-16, April 17, 2009; Ex. D, O'Neill Dep. 75, Nov. 7, 2008.) Francisco and Wood testified that, if workers had safety concerns, they

---

[6] Polewski also stated that, to his knowledge, Durr did not inspect his work. (Defs.' SOF, Ex. F, Polewski Dep. 111.) Neely could not recall whether Durr inspected Aristeo work. (Defs.' SOF, Ex. H, Neely Dep. 32, May 1, 2008.)

should raise them with the foremen. (Defs.' SOF ¶ 23, Ex. E, Francisco Dep. 18; Ex. G, Wood Dep. 80.)

Polewski stated that only Aristeo foreman supervised and dictated his work, though he did say that he had seen Ford stop the work of other subcontractors. (Pl.'s Resp. to Defs.' SOF ¶ 20, Ex. F, Polewski Dep. 26-34.) He also testified that, while he worked for Aristeo, he had never seen a Ford employee stop the work of Aristeo or any of its employees. (Pl.'s Resp. to Defs.' SOF ¶ 25, Ex. F, Polewski Dep. 34-37.)

Knaak also communicated frequently with Alberici Manager Brown about work plans, work locations, and other matters. (Defs.' Resp. to Pl.'s Additional Facts ¶ 5.) Brown said that Knaak would be onsite at Alberici's project almost every day, attending meetings and walking the site. (*Id.*) These meetings also involved Ford's project coordinator, Bill Turner, who Brown saw walking the Project every day. (Pl.'s Additional Facts ¶ 7, Ex. V, Brown Dep. 25-26, Aug. 9, 2007.)

Knaak also apparently had interaction with James Ford ("James"), Alberici's project safety coordinator, until around late July or early August of 2003. (Defs.' Resp. to Pl.'s Additional Facts ¶ 18.) In that capacity, James ensured safe work practices. (*Id.*) During his employment, James reported to his supervisor, who then reported to Ford Supervisor Knaak. (Pl.'s Additional Facts ¶ 19, Ex. Z, Ford Dep. 21, Aug. 8, 2007.) Despite this chain of command, James saw and interacted with Knaak several times a week. (Pl.'s Additional Facts ¶ 19, Ex. Z, Ford Dep. 21-22.)

On these occasions, James would discuss with Knaak what he was doing to ensure that Alberici was meeting Ford's expectations. (Pl.'s Additional Facts ¶ 19, Ex. Z, Ford Dep. 22-24.)

Although James could not recall an instance where Knaak had stopped Alberici's work, he did state that Knaak had relayed safety concerns to him "a few times"–at least one of which concerned an individual not wearing safety glasses. (Pl.'s Additional Facts ¶ 19, Ex. Z, Ford Dep. 23-24.) As a result of Knaak's directive, James told the employee to use safety glasses. (Pl.'s Additional Facts ¶ 19, Ex. Z, Ford Dep. 24.)

As to safety generally, James stated that, at Ford's safety orientation, Ford expressly stated that contractors were prohibited from using man-lifts to hoist I-beams. (Pl.'s Additional Facts ¶ 22, Ex. Z, Ford Dep. 68-70.) James also testified that Ford designated certain areas for contractor work. (Pl.'s Additional Facts ¶ 23, Ex. Z, Ford Dep. 43.) Contractors could not work outside of these areas. (*Id.*)


### C.     Plaintiff's Safety Training

After being hired by Aristeo, Plaintiff underwent safety training at the Plant. Although Plaintiff testified that Ford's Ted Tilicki or Knaak conducted the training (Defs.' SOF, Ex. C, O'Neill 13, 23-24, April 17, 2008), Aristeo Foreman Francisco stated that Aristeo provided it (Defs.' SOF ¶ 26, Ex. E, Francisco Dep. 60-61). During this safety training, Plaintiff was instructed not to use an aerial work platform (or "man-lift") to hoist materials and equipment at the Plant. (Defs.' SOF ¶ 27.) Francisco and Plaintiff, however, both testified that a man-lift was "an appropriate piece of equipment" that could be used to install an I-beam. (Pl.'s Resp. to Defs.' SOF ¶ 37, Ex. E, Francisco Dep. 20, 23; Ex. Y, O'Neill Dep. 23, April 17, 2008.) Francisco also stated that, "[t]he foreman has a say in how to install that piece of steel, but if a person thinks it's unsafe or something, you just don't do it." (Defs.' SOF, Ex. E, Francisco Dep. 26.)

Beyond mere instruction, contractors and subcontractors received a manual from Ford entitled, "Safety Guidelines and Information for Contractors" ("the Guidelines," "Safety Guidelines," or "the Ford Guidelines"), which contained the applicable safety guidelines.[7] (Defs.' SOF ¶ 28, Ex. I.) These Guidelines specifically provided a set of minimum safety "information" that must be provided to a man-lift operator.[8] (Defs.' SOF ¶ 28; Ex. I at 14, § 6.2(B).) They also prohibited the contractors from using any "powered industrial moving equipment, trucks, tools, or ladders belonging to, or rented by, . . . [Ford]." (Defs.' SOF, Ex. I at 6, § 3.3(Q).) Plaintiff was aware of these rules and knew they had to be followed without compromise. (Defs.' SOF ¶ 31.) Moreover, a site safety coordinator told Plaintiff specifically not to use a man-lift to lift or hoist beams. (*Id.*) Plaintiff answered "yes" when asked if "it was [his] understanding . . . from . . . orientation with the Ford people that[,] had they seen [him] operating a man[-]lift and lifting up a steel I-beam[,] . . . [he] could have been fired?"(Defs.' SOF, Ex. C, O'Neill Dep. 84, April 17, 2008.)

Additionally, the Guidelines imposed numerous "safety requirements" to which the contractors and subcontractors had to adhere. (Pl.'s Resp. to Defs.' SOF, Ex. I at 5-14.) These included providing the following: minimum guidelines that needed to be given to each operator of a man-lift (*Id.* at 14, § 6.2(A)-(B)); physical barriers along the perimeter of the worksite (*Id.* at

---

[7] The Ford Guidelines were part of the contract contractors signed with Ford or other subcontractors. (Defs.' SOF, Ex. I at 1.)

[8] Additionally, the Guidelines required all contractors and their employees to comply with the Occupational Safety and Health Administration's ("OSHA") regulations. (Defs.' SOF ¶ 29.) This includes 29 C.F.R. § 1910.068(d)(1), which prohibits the handling on man-lifts "freight, packaged goods, pipe, lumber, or construction materials of any kind." (Defs.' SOF ¶ 29.) Additionally, the American National Standards Institute ("ANSI") prohibits use of an aerial work platform as a crane. (Defs.' SOF ¶ 30.)

6, § 3.3(M)); requirements for ladders and their use (*Id.* at 6, § 3.3(L)); requirements for tool storage and cleanup (*Id.* at 6, § 3.3(O)); methods for using a pneumatic hammer on concrete (*Id.* at 7, § 3.3(R)); requirements for protective eyewear (*Id.* at 7(Y)); detailed requirements for a safety program to be instituted by the contractor (*Id.* at 8, § 3.3(AH)); proscriptions against makeshift machinery or scaffolding (*Id.* at 6, § 3.3(K)); proscription on use of Ford's equipment (*Id.* at 6, § 3.3(Q)); and general requirements to wear safety gear (*Id.* at 7, § 3.3(S)).

The Ford Guidelines also prescribed what other steps contractors and subcontractors needed to take to ensure adequate safety. They required "all CONTRACTORS and Subcontractors [to] provide a safety coordinator for the duration of their contract." (Defs.' SOF, Ex. I at 1, § 1.1(A).) All contractors also were required to comply with any reasonable safety rules and practices Ford established before or during the work of the contract. (Defs.' SOF, Ex. I at 2, § 1.1(B)(4).) Additionally, the Guidelines required contractors and subcontractors to "establish a safety program for the project[,] . . . [which] shall be reviewed with the Contract Administrator[] or their designated representative before proceeding with the project." (Defs.' SOF, Ex. I at 2, § 1.1(E).) The "Prime Contractor" was responsible for "[s]ecurity and cleanup." (Defs.' SOF, Ex. I at 2, § 1.1(G).) Ford retained the "right to monitor (CONTRACTOR shall still be responsible for assuring safe work practices) the CONTRACTORS' operations for safety performance, workmanship, security, and protection of operations, work progress, housekeeping, and compliance to design specifications." (Defs.' SOF, Ex. I at 2, § 1.1(D).) While the contract stated it was Ford's general practice to work "through the contractor" and not directly with the employee, Ford reserved the right to do so–and to discipline or terminate the employee or the contractor. (Defs.' SOF, Ex. I at 2, § 1.1(D).)

"Contracts require[d] that Prime Contractors provide a Safety Coordinator to work exclusively on safety issues for the project," and the Safety Coordinator had to meet requirements set forth by the Guidelines, which required the contractor to submit this person's resume to Ford. (Defs.' SOF, Ex. I at 3, §§ 2.1(A), (D).) This Safety Coordinator was responsible for conducting initial onsite safety training and orientation for all people (Defs.' SOF, Ex. I at 4, § 3.1(E)); for establishing a safety program that included general and specific safety guidelines for each trade; and for ensuring that qualified people were operating the machinery and equipment (Defs.' SOF, Ex. I at 5, § 3.2(A)). The Safety Coordinator was required to "establish, enforce, educate, supervise, and direct all personnel associated with the contract in the requirements of the policies, procedures and site safety programs"–which included the right to stop work—and hold weekly meetings with contractors and subcontractors. (Defs.' SOF, Ex. I at 6, §§ 3.2(D)-(F).) The contractor was responsible for "immediately abat[ing] the unsafe act, behavior, or equipment of any individual failing to follow these [G]uidelines." (Defs.' SOF, Ex. I at 6, § 3.3(H).)

Apparently as part of this compliance, regular "toolbox-talk" safety meetings were held. (Defs.' SOF ¶ 35.) Plaintiff stated that, while the makeup of the individuals meeting at each toolbox-talk varied, it never included anyone other than Aristeo employees. (Defs.' SOF ¶ 35, Ex. C, O'Neill Dep. 29.)

## D.  Plaintiff's Accident

Plaintiff was injured while installing an I-beam (with his partner, Polewski) for Aristeo on the south end of the mezzanine at the Plant in January 2004.[9] (Defs.' Resp. to Pl.'s Additional Facts ¶ 27.) Prior to his injury, Plaintiff had installed I-beams at the Ford Plant for at least fifteen days and never had used a man-lift to do so. (Pl.'s Resp. to Defs.' SOF ¶ 32.) On the date of the injury, Plaintiff and Polewski were installing an I-beam—which was eight-feet long, and one-foot tall[10]—approximately fifteen feet off the ground. (Pl.'s Resp. to Defs.' SOF ¶ 43; Defs.' Resp. to Pl.'s Additional Facts ¶ 29.) Polewski had seen unidentified individuals at the Ford Plant use a man-lift to hoist I-beams. (Defs.' Resp. to Pl.'s Additional Facts ¶ 28.)

Typically, workers would install the I-beam using a "deck crane,"[11] which they would use to lift the I-beam into place. On this day, however, Plaintiff testified that they could not use a crane because the overhead assembly line was running and there were toolboxes and a cart in the way. On this point, Plaintiff gave the following testimony about the day of the injury:

> Q.  I assume that someone had to bring . . . the eight-foot beam into the area[,] and it was laying on the ground somewhere, right –
>
> A.  Yes.

---

[9] Plaintiff does not recall the exact date of his injury but knows it occurred on either January 10, 2004, or January 18, 2004. (Pl.'s Resp. to Defs.' SOF ¶ 40.)

[10] Polewski testified that he thought the beam weighed around one hundred and eighty pounds. (Pl.'s Resp. to Defs.' SOF, Ex. F, Polewski Dep. 57.)

[11] A "deck crane" is a portable crane that has four wheels and a boom. (Defs.' Resp. to Pl.'s Additional Facts ¶ 24, Ex. Z, Ford Dep. 33-37.) Workers typically use a deck crane to hang steel inside a building, though it requires a certain amount of room to be useful. (Id.) Workers also can hang steel using a "come-along" or "chain fall," but no one from Ford saw this method being used. (Id.)

Q. – before you put it up there? . . . Was there an attempt to get a crane in the area to lift it up?

A. Yes.

. . . .

Q. The day of the accident there was an attempt to get a crane in to lift the beam up; is that right?

A. Yes.

. . . .

Q. . . . When a crane would be required to do a job like this, who would typically organize that or procure the crane?

A. Aristeo.

Q. So your foreman or Dave Wood or someone from Aristeo would say, "We need a crane here," and the crane would be there for you guys to use with an operator; is that right?

A. Yes, we had that operator pretty much throughout the whole mezzanine erection process.

Q. Okay. And had you used . . . [the] crane to hoist other beams up before the day you were injured?

A. Yes.

Q. Okay. Well, tell me why you could not use the crane to hoist the beam the day you were injured.

A. There was an overhead assembly line that was running that they wouldn't shut off. And when we tried to bring it in to get into position[,] . . . we couldn't get in there. The aisle was blocked with equipment that wasn't our equipment.

Q. Okay. Let me talk about the first thing you talked about . . . . The overhead assembly line was running. What was on the assembly line?

A. Nothing was moving on it.

    . . . .

Q. . . . [W]hat about the assembly line running prevented you from getting the crane over in that area to put the I-beam up?

A. Well, the crane's boom couldn't go underneath it and it couldn't go over it. If we went over it, the cable would get stuck or had a possibility of getting stuck in the moving conveyor. So that would have created a dangerous situation. And then the head room for the boom to get underneath the assembly line to where the height of the beam had to go up, there was not enough room.

    . . . .

Q. Okay. [Would] . . . turning the assembly line off . . . have allowed for more room?

A. They wouldn't turn it off.

Q. Okay. But [would] turning the assembly line off . . . allow the crane to have more room?

A. It might have.

    . . . .

A. It wouldn't make more room for the crane being there, but if we had the option of going above it, that would have been another option.

    . . . .

Q. What type of material or machinery was in the aisleway?

A. There were toolboxes and there was a . . . cart that had body panels on it.

    . . . .

Q. Do you know whose equipment the toolboxes were?

A. No.

Q. Do you know whose cart that . . . was?

A. That was a Ford cart.

Q. Had the crane operator actually tried to drive the crane into the aisleway?

A. Yes. We brought the beam in on the deck of the crane.

Q. Okay. And he wasn't able to bypass these toolboxes and this cart?

A. No, he was not able to navigate.

Q. After he was unable to get the crane in there, did you make any request that these materials be moved?

A. Yes, we did.

Q. Okay. And who did you ask?

A. I asked Bill Francisco. [At this point in the deposition, Plaintiff also speculated without any knowledge that] Bill asked Dave Wood[, and that] Dave Wood went to ask Steve Knaak.

. . . .

Q. Okay. So what sort of . . . response . . . came back . . . to you as to why you couldn't get the crane in there?

A. That they're not going to move it and just get it in and hurry up.

Q. And who told you that? Was that Bill?

A. Dave [Wood].

(Defs.' SOF, Ex. C, O'Neill Dep. 30-37, April 17, 2008.) Francisco and Wood deny ever

receiving any request from either Plaintiff or Polewski about moving or turning off equipment

(Pl.'s Resp. to Defs.' SOF ¶ 60), and Wood said he would remember a request to ask Ford to

move debris and equipment so a crane could get into position (Pl.'s Resp. to Defs.' SOF ¶ 61). Wood denies even working the day of the injury. (Pl.'s Resp. to Defs.' SOF ¶ 65).

Plaintiff admitted that he never complained to anyone from Ford about the obstructions. (Pl.'s Resp. to Defs.' SOF ¶ 72). Polewski stated he did not see anyone from Ford in the area during these events, as he was busy performing his task. (Pl.'s Resp. to Defs.' SOF ¶ 74.) He also stated that he didn't see anyone from Durr in the area at the time. (Defs.' SOF, Ex. F, Polewski Dep. 109-110, 112.)

Plaintiff and Polewski testified that Aristeo Superintendent Wood told the foremen to use the man-lift to quickly install the I-beam. (Defs.' SOF ¶ 50, Ex., O'Neill Dep. 41–42, April 17, 2008; Ex. F, Polewski Dep. 53-54.) Polewski stated that he objected to using the man-lift but Wood said, "Do it or else." (Defs.' SOF, Ex. F, Polewski Dep. 96-97.) Wood stated that he never would allow ironworkers to use a man-lift to hoist a beam unless there was no other way to proceed, and equipment blocking an aisle would not be such an instance. (Pl.'s Resp. to Defs.' SOF ¶ 62.) Aristeo Foreman Francisco also disputed these facts, stating that he did not recall Plaintiff raising an issue with the equipment being in the aisleways, and that he would stop an employee from using a man-lift to install an I-beam. (Pl.'s Resp. to Defs.' SOF ¶¶ 63-64.) Francisco said that, if an ironworker brought to his attention a task he felt was unsafe, he would have taken action. (Pl.'s Resp. to Defs.' SOF ¶ 67.)

When the incident occurred, Plaintiff and Polewski knew and understood that Ford or Aristeo could terminate their employment for using a man-lift to hoist an I-beam. (Pl.'s Resp. to Defs.' SOF ¶ 57.) Nevertheless, they both feared that they would be fired if they did not install the I-beam using the man-lift. (Pl.'s Resp. to Defs.' SOF ¶ 58.) While Plaintiff had used a man-lift

to install an I-beam on at least two dozen other occasions, it was the first time he did so on the Project at the Plant. (Defs.' SOF, Ex. C, O'Neill Dep. 22-23, 151, April 17, 2008.)

Plaintiff knew he would have to manually manipulate the beam to move it into position. (Pl.'s Resp. to Defs.' SOF ¶ 51.) He also stated that he and Polewski brought the beam into the work area on a crane's carry-deck; placed the beam on the rails of the man-lift basket; drove the man-lift into place; and then raised the man-lift up, including the I-beam and themselves, to the height of approximately fifteen feet. (Pl.'s Resp. to Defs.' SOF ¶ 52.) The man-lift Plaintiff and Polewski used was equipped with an articulating arm, the end of which attached to a two-man basket. (Pl.'s Resp. to Defs.' SOF ¶ 53.)

Once the man-lift was in position, the men lifted the I-beam into position, with Polewski installing his end first. (Pl.'s Resp. to Defs.' SOF ¶ 54.) When Plaintiff installed his end, he pushed the beam with his shoulder, injuring it in the process. (Pl.'s Resp. to Defs.' SOF ¶ 55.) Plaintiff stated that, within a few days after his accident, he reported his injury to Ann Henkel, C-Logic's safety manager. (Pl.'s Resp. to Defs.' SOF ¶ 23, Ex. D, O'Neill Dep. 65-70, Nov. 7, 2008.) On October 18, 2005, Plaintiff filed a lawsuit against Defendants for the injuries he sustained in January 2004. (Defs.' SOF ¶ 1.)

## E.    Other Parties to the Case

As noted above, Plaintiff sued several entities. Because some of the facts related to these parties do not fit neatly within the chronology laid out above, they are recounted here.

### 1. Alberici

Although Durr had previously hired Alberici to erect the mezzanine, that contract was canceled on August, 18, 2003. (Defs.' SOF ¶ 80, Ex. N at 1-2.) Thus, according to Durr's contract with Alberici, on the day Plaintiff was injured, Alberici was not to be performing work in the south mezzanine where the injury occurred. (*Id.*, Ex. N at 1-2.) Although Brown stated that Alberici continued to perform work in that area as late as December 2003 (Pl.'s Resp. to Defs.' SOF ¶ 80, Ex. V, Brown Dep. 34), there is no evidence of Alberici working in the south mezzanine after that time period. Moreover, Alberici never provided Plaintiff with equipment or tools for his work at the Plant. (Pl.'s Resp. to Defs.' SOF ¶ 82.)

There is no evidence that Alberici controlled, supervised, or inspected Plaintiff's work in any way. Furthermore, Plaintiff was not bound by any contract to perform work for Alberici. (Pl.'s Resp. to Defs.' SOF ¶ 86.) There is no evidence showing that any of the obstruction to Plaintiff's work belonged to Alberici. (Pl.'s Resp. to Defs.' SOF ¶ 87.)

In terms of upper-level, onsite management, Alberici also employed a superintendent on the project, Steve Richardson ("Richardson"). (Pl.'s Additional Facts ¶ 12, Ex. W, Richardson Dep. 17, Aug. 9, 2007.)[12] Richardson had communications with Ford Supervisor Knaak about once a month. (*Id.*) On several occasions, Knaak told Richardson that employees were not "tying off" correctly. (*Id.*) Richardson stated that, when Knaak brought this kind of information to his attention, he would have to fire the employee–Knaak would not allow him to institute remedial measures. (*Id.*) In other words, Knaak had ultimate authority to terminate people for safety

---

[12] Pages 9-16 are missing from Richardson's deposition in all of the parties' exhibits. The Court, therefore, cannot consider any of the facts drawn from those pages.

violations. (*Id.*, Ex. W at 20.) He also stated that Knaak was walking around the jobsite everyday and surmised that Knaak was looking for safety violations. (Pl.'s Additional Facts ¶ 12, Ex. W, Richardson Dep. 19.)

Additionally, Richardson said he had contact with a Tri-Tec employee named Arlyn, with whom he would discuss scheduling and manpower about twice a week. (Pl.'s Additional Facts ¶ 13, Ex. W, Richardson Dep. 21-22.) Ford employee Bill Turner also met with Richardson to discuss manpower and scheduling. Although Richardson could not recall with accuracy, he stated that either Turner or Arlyn would specify Alberici's lay-down areas. (Pl.'s Additional Facts ¶12, Ex. W, Richardson Dep. 23.)

Sometimes materials would have to be moved, which would require a schedule change, according to Richardson. To make this change, he would go to "Ford, Tri-Tec, [or] whoever [he was] working for." (Pl.'s Additional Facts ¶ 14, Ex. W, Richardson Dep. 28.) Brown, Alberici's project manager, also had stated that twice Alberici had been asked to move material storage locations, once by Melton and once by Turner, because of Ford's "needs." (Pl.'s Additional Facts ¶ 8, Ex. V, Brown Dep. 36.) Richardson stated that he observed Aristeo employees hoisting and installing I-beams with a crane. (Pl.'s Additional Facts ¶ 15, Ex. W, Richardson Dep. 25.) Richardson also stated that workers not being able to fit the machinery into the work area was "a common problem." (Pl.'s Additional Facts ¶ 17, Ex. W, Richardson Dep. 39.) On the day Plaintiff was injured, Richardson was in charge of seven Alberici employees working on the north mezzanine installing drive belts on the floor of the conveyor. (Pl.'s Additional Facts ¶ 16, Ex. W, Richardson Dep. 33-34.)

## 2. Tri-Tec, Durr, and Alberici

Tri-Tec's role at the Plant involved project coordination, progress, and quality. (Pl.'s Resp. to Defs.' SOF ¶ 88.) Wood testified that Tri-Tec did not direct Aristeo's means and methods of work (Defs.' SOF, Ex. G, Wood Dep. 36-37); Neely stated that Tri-Tec never provided him with manuals, training, or equipment, and that he never asked Tri-Tec for any directions or instructions (Defs.' SOF, Ex. H, Neely Dep. 35); and Plaintiff confirmed that he never received direction from any Tri-Tec employee. (Defs.' SOF, Ex. C, O'Neill Dep. 117, April 17, 2008).

The evidence also shows that Tri-Tec did not provide Aristeo with any equipment–and there is no evidence showing that Tri-Tec inspected any of Aristeo's work. (Defs.' SOF ¶ 90.) On the date of Plaintiff's accident, no one saw any Tri-Tec employees in the area where the injury occurred.

Recall that Tri-Tec contracted Durr to perform some of its work. Under this contract, Durr assumed all the obligations and responsibilities that Tri-Tec had assumed in its contract with Ford. (Pl.'s Resp. to Def.'s SOF, Ex. BB at 2.) Durr agreed to perform certain procedures, such as taking down work that Tri-Tec, Ford, or the architect condemned as unsound, improper, or failed to conform in any way to the Agreement between Ford and Tri-Tec. (Pl.'s Resp. to Def.'s SOF, Ex. BB at 5.) Durr also agreed to protect its workers from harm arising from its work and to comply strictly with the safety program, policies, and procedures, of Tri-Tec and Ford. (Pl.'s Resp. to Def.'s SOF, Ex. BB at 5.) This included any contractual requirements imposed on Durr through Tri-Tec's contract with Ford. Additionally, Durr agreed to comply with special conditions, including the Ford Guidelines. (Pl.'s Resp. to Def.'s SOF, Ex. BB at 8.) Tri-Tec also

communicated with Alberici's project manager, Robert Brown, on a regular basis. (Defs.' Resp. to Pl.'s Additional Facts ¶ 14, Ex. W, Richardson Dep. 11.) They would discuss project coordination issues, including contractor-to-contractor issues with people from Tri-Tec. (*Id.*)

### 3. C-Logic

Under its contract with Aristeo, C-Logic "provide[d] safety management services" at the Ford Plant. (Defs.' SOF, Ex. S at 1.) This included providing two safety engineers who "work[ed] full-time with . . . [Aristeo] to establish what is expected" of the employees during the project. (*Id.*) It also included C-Logic providing site-specific employee training for new hires; daily safety supervision and walkthrough; jobsite analysis and recommended corrective measures; accident reporting an investigation; maintenance of OSHA-mandated safety logs; and regular "toolbox-talks" for pertinent safety issues. (*Id.*) Additionally, the contract provided that C-Logic would attend or chair safety committee meetings on behalf of Aristeo, and assist with office and site paperwork as time allowed or was needed. (*Id.*) One of the general "terms and conditions" of the contract states that "C-[L]ogic's work shall not include determining, supervising, or implementing means, methods, techniques, or procedures of construction." (*Id.* at 2.)

Ann Henkel, C-Logic's safety manager, said she worked in an area different from the one in which Plaintiff was injured. (Defs.' SOF, Ex. R, Henkel Dep. 46, Feb. 6, 2009.) She testified that she would, on a daily basis, walk around, observe the work being performed, and look for safe or unsafe work practices on the Aristeo project (located on the south end of the mezzanine). (*Id.*, Ex. R, Henkel Dep. 16-20.) She also stated that she would consult with someone from Aristeo about safety. (*Id.*, Ex. R, Henkel Dep. 16-17.) There is no evidence showing that Henkel

or C-Logic knew of Plaintiff and Polewski's efforts to lift the I-beam using a man-lift. (*Id.*, Ex. R, Henkel Dep. 16-17.) If Henkel found a safety infraction, she would report it to Aristeo "management" (i.e., the foreman). (*Id.*, Ex. R, Henkel Dep. 21, 22.) Henkel said she did not have authority to halt the unsafe practice. (*Id.*, Ex. R, Henkel Dep. 21-22.)

## II. Summary Judgment Standard and Applicable Law

### A. Summary Judgment Standard

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and affidavits show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court views all facts in the light most favorable to Plaintiff and draws all justifiable inferences in his favor. *Anderson*, 477 U.S. at 255. Not all factual disputes will preclude summary judgment; rather, a genuine issue of material fact will exist only where there is evidence such that a jury "could reasonably find for the [nonmoving party]." *Id.*

The parties may not rely on mere allegations or speculation in arguing for or against summary judgment. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 737 (7th Cir. 2008). At the summary judgment stage, both sides must support their factual assertions with "competent evidence of a type otherwise admissible at trial." *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

## B.    Applicable Law

In a diversity case, like this one, the court applies the substantive law of the forum state. *Mass. Bay Ins. Co. v. Vic Koenig Leasing, Inc.*, 136 F.3d 1116, 1120 (7th Cir. 1998) (affirming the general principle from *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426 (7th Cir. 1991), that federal courts apply the law in which the court sits absent a conflict between the parties). Because Plaintiff filed his tort claim in Illinois and the parties don't contest the issue of which law governs, the Court applies Illinois law. The Court decides this matter as it believes the Illinois Supreme Court would, *Lexington Ins. Co. v. Rugg & Knopp, Inc.*, 165 F.3d 1087, 1090 (7th Cir. 1999), giving "'proper regard' to other Illinois courts' rulings." *Estate of Bowgren v. Comm'r of Internal Revenue*, 105 F.3d 1156, 1161 (7th Cir. 1997). In other words, "[w]here the state supreme court has not ruled on an issue, decisions of the state appellate courts control, unless there are persuasive indications that the state supreme court would decide the issue differently." *Lexington*, 165 F.3d at 1090. Nevertheless, this Court's regard for Illinois Appellate Court decisions is tempered by its deference to Seventh Circuit precedent.

## III.  Discussion

Plaintiff alleges that all Defendants are liable on various tort theories that focus on Defendants' allegedly negligent conduct. Negligence liability requires the plaintiff to show that (1) she suffered an injury; (2) the defendant owed the her a duty of care; (3) the defendant breached that duty of care; and (4) the defendant's breach proximately caused the her injury. *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1053 (Ill. 2006). First, Plaintiff alleges that Defendants are liable for "construction negligence" under the RESTATEMENT (SECOND) OF TORTS

§ 414 ("§ 414") (1965). Second, he argues that, regardless of whether § 414 applies, Defendants

are liable on a theory of premises liability under the RESTATEMENT (SECOND) OF TORTS § 343

("§ 343") (1965).[13]  Because Plaintiff asserts these two claims against each Defendant, the Court

addresses each separately. In so doing, the court first explains the law of each claim and then

applies it to the Defendants individually.

Plaintiff also alleges two other theories of liability. Against C-Logic and Tri-Tec, Plaintiff

alleges liability on a theory of voluntary undertaking as stated by the RESTATEMENT (SECOND) OF

TORTS § 323 ("§ 323") (1965). Finally, as to Alberici, Plaintiff contends that it is liable under a

theory of common-law negligence.


## A.      Restatement § 414

First, Plaintiff alleges that Ford, Tri-Tec, Durr, and C-Logic are liable for his injuries.

Ordinarily, one who employs a independent contractor is not liable for its acts or omissions.

Section 414 is an exception to that rule:

> A possessor of land who has employed or permitted an independent
> contractor to do work on the land, and knows or has reason to know
> that the activities of the contractor or conditions created by him
> involve an unreasonable risk of physical harm to those outside of the
> land, is subject to liability to them for such harm if he fails to exercise
> reasonable care to protect them against it.

RESTATEMENT (SECOND) OF TORTS § 414. Section 414 is the law in Illinois. *Aguirre v. Turner*

*Constr. Co.* (Aguirre I), 501 F.3d 825, 828 (7th Cir. 2007) (citing *Larson v. Commonwealth*

*Edison Co.*, 211 N.E.2d 247 (Ill. 1965)). While Illinois courts have offered inconsistent decisions

---

[13] Plaintiff has not alleged that Alberici is liable under either § 414 or § 343. Therefore, the Court does not address in its analysis whether Alberici is liable under these sections.

about whether this section gives rise to vicarious or direct liability, the Seventh Circuit recently

clarified its thoughts on the issue: section 414 articulates a theory of direct, not vicarious,

liability. *Aguirre I*, 501 F.3d at 829.

In making its decision, the *Aguirre I* court focused on what it perceived as a common

misreading of comment *a*, which states:

> If the employer of an independent contractor retains control over the
> operative detail of doing any part of the work, he is subject to liability
> for the negligence of the employees of the contractor engaged therein,
> under the rules of that part of the law of Agency which deals with the
> relation of master and servant. The employer may, however, retain a
> control less than that which is necessary to subject him to liability as
> master. He may retain only the power to direct the order in which the
> work shall be done, or to forbid its being done in a manner likely to
> be dangerous to himself or others. Such a supervisory control may not
> subject him to liability under the principles of Agency, but he may be
> liable under the rule stated in this Section unless he exercises his
> supervisory control with reasonable care so as to prevent the work
> which he has ordered to be done from causing injury to others.

In *Aguirre I*, the court specifically rejected the argument that comment *a* explained when

§ 414 applied. Instead, it held that comment *a* "demarcat[es] the boundary between agency law

(which if applicable imposes vicarious liability) and the negligence principles encompassed in

section 414." *Id.* at 829. Liability under § 414, therefore, is premised on the existence of a

duty–not on a master-servant relationship. *Id.*; *Aguirre v. Turner Constr. Co.* (Aguirre II), 582

F.3d 808, 812 (7th Cir. 2009) ("[A] simpler, more perspicuous way to think about this case is in

terms of duty rather than control.").

Although tort law speaks in terms of duty, § 414 bases this duty on a theory of control:

"[t]hat duty is triggered when the employer–usually a general contractor–has retained supervisory

control over the independent contractor without retaining control over all operative details of a project." *Aguirre I*, 501 F.3d at 829 The question of control is one of law. *Id.*

To meet the control threshold–i.e., to have the necessary control to take action and, therefore, be liable for an act or omission–the general contractor must have control over the "means and methods" by which the subcontractor performs its work. *Id.* at 830. In particular, the question is whether the general contractor "*sufficiently affected* a contractor's means and methods of doing its work." *Id.* 830-31 (discussing this standard generally and as applied in *Martens v. MCL Construction Corp.*, 807 N.E.2d 480, 491 (Ill. App. Ct. 2004), and then applying it to the case before it). To determine this, the court examines (1) the contract language, (2) whether and what authority the general contractor's employees had to stop deficient work of subcontractors; (3) whether, what amount, and the method of oversight the general contractor exercised over the work the plaintiff performed for the subcontractor; and (4) whether and what specific safety rules the general contractor promulgated for the work in question. *Id.* at 830-31 (distinguishing *Martens*, 807 N.E.2d at 491, *Kotecki v. Walsh Construction Co.*, 776 N.E.2d 774, 778 (Ill. App. Ct. 2002), and *Rangel v. Brookhaven Constructors, Inc.*, 719 N.E.2d 174, 176 (Ill. App. Ct. 1999); and analogizing *Moorehead v. Mustang Construction Co.*, 821 N.E.2d 358 (Ill. App. Ct. 2004), and *Bokodi v. Foster Wheeler Robbins, Inc.*, 728 N.E.2d 726 (Ill. App. Ct. 2000)).

Where there is sufficient control, liability attaches in either of two situations. First, liability arises if the general contractor knew or should have known that the subcontractor was performing work dangerously and "ha[d] the opportunity to prevent it" using the control it retained. *Aguirre I*, 501 F.3d at 828 (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt.

b). "Liability also arises if the general contractor 'knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control to cause the subcontractor to do so.'" *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. b).

Going forward, the Court remains aware that the Seventh Circuit has rejected as a theory of § 414 liability the "operative details" approach. *Aguirre I*, 501 F.3d at 829 (stating that the defendant's "duty is triggered when the employer–usually a general contractor–has retained supervisory control over the independent contractor *without retaining control over all operative details of a project*") (emphasis added); *id.* at 828 (expressly rejecting the reading by the Illinois Appellate Court in *Cochran v. George Sollitt Construction Co.*, 832 N.E.2d 355, 361 (Ill. App. Ct. 2005), which stated that, "[a]s comment *a* to section 414 clarifies, the general contractor, by retaining control over the operative details of its subcontractor's work, may become vicariously liable for the subcontractor's negligence"). Thus, many holdings of the Illinois Appellate Court decisions may not be relevant given their reading of § 414 as imposing both vicarious and direct liability, and using different standards to evaluate each.[14]

_____

[14] As a result of their misreading of § 414, some courts have misapplied that section. *E.g.*, *Calderon v. Residential Homes of Am., Inc.*, 885 N.E.2d 1138, 1146-1151 (Ill. App. Ct. 2008) (describing § 414 as delineating theories of vicarious and direct liability, and then applying the direct liability theory without reference to "control"). Since vicarious liability requires a different degree of control than direct liability, these courts' holdings do not always have direct relevance to the resolution of this case under *Aguirre I*.

1.    Ford

Ford argues that it did not exercise the requisite degree of control to impose § 414

liability because Plaintiff received all work instructions from Aristeo Superintendent Wood or

Aristeo Foreman Francisco. (Ford's Mem. of Law in Supp. of Mot. for Summ. J. 6.) It also argues

that, although Ford's Safety Guidelines applied to Aristeo, Ford did not control the means and

methods of Aristeo's work; Aristeo was free to conduct its work in the manner it saw fit. (*Id.*)

The Court disagrees, though for reasons different from those Plaintiff provides. Initially,

Plaintiff directs the court to the testimony of Alberici's project manager, Robert Brown, to show

that Ford retained sufficient control over Aristeo. (Pl.'s Mem. in Opp'n to Ford's Mot. Summ. J.

9.) Brown stated that he saw Ford employees escort electricians (non-Aristeo employees) off the

project. Although Brown's testimony is highly speculative, at this stage, the Court must make

reasonable inferences in Plaintiff's favor, and so it infers that these individuals were being

escorted from the site by Ford for safety violations.

Even with that generous inference, however, Alberici Manager Brown's testimony is

irrelevant to the issue of whether Ford sufficiently controlled *Aristeo*. Ford's control over *Alberici*

is not at issue here–and neither is its dealings with them insofar as they fail to affect Aristeo.[15]

While the same contract governs both subcontractors, the contract alone does not determine a

duty[16]–it is the contractor's actions that do so.[17] *See Aguirre I*, 501 F.3d at 830 ("In determining

---

[15] This logic also applies to Plaintiff's claim that Ford dictated where Aristeo stored its
materials. (Pl.'s Resp. to Ford's Mot. for Summ. J. 8.) The problem with this proposition is the
supporting citation, which refers to *Alberici* Manager Brown's testimony that Ford controlled
where *Alberici* placed its materials. (Pl.'s Resp. to Defs.' SOF, Ex. V at 36.)

[16] This is especially relevant when the contract retains for the general contractor general
(continued...)

whether [the] [requisite] level of control has been retained, Illinois courts ask whether the principal merely retained general oversight of work progress and safety or *actually engaged* in detailed supervision and/or control of subcontractors' methods and means of performing work.") (emphasis added); *id.* at 831 (stating that a contractual delegation of safety duties to a subcontractor does not control the question of whether the general contractor exercised sufficient control of the work); *Calderon*, 885 N.E.2d at 1147-1148 (stating that a contract is the best evidence of control, but also noting that contracts and safety programs alone do not constitute per se control). Unfortunately for Plaintiff, the transitive property does not apply to control over contractors: the general contractor's control over one subcontractor does not per se determine the general contractor's control over a different subcontractor. A finding of control is based on both the contract and the *actual control* exercised by the general contractor over a *particular* subcontractor.

Plaintiff also points to his own request to Francisco that materials blocking the aisle be moved, and his speculation that Francisco passed this request along to Aristeo Superintendent

-----

[16](...continued)
rights, such as the right to stop other contractors' work or fire them or their employees.

[17] Contract language alone may be enough, however, where the contract expressly *requires* the contractor to sufficiently affect the means and methods of any part of the plaintiff's work. *See, e.g., Martens*, 807 N.E.2d at 492 (when deciding if a duty exists under § 414, "[t]he central issue is [the] retained control of the independent contractor's work, whether *contractual, supervisory, or some mix thereof*") (emphasis added); *see also Moss v. Rowe Constr. Co.*, 801 N.E.2d 612, 613, 619-21 (Ill. App. Ct. 2003) (finding sufficient control based on a contract that delegated all safety and construction operations, and attendant authority, to the general contractor; that required subcontractor to follow the contractor's directions regarding safety, clean-up, and storage; and that prevented the general contractor from delegating this duty to others). Plaintiff does not direct the Court to any such language, and the Court finds none in the contract.

Wood and then to Ford Supervisor Knaak. Plaintiff then said "the response that came back 'down the line'" was "[t]hat they're not going to move it and just get [the steel] in and hurry up." (Pl.'s Mem. in Opp'n to Ford's Mot. Summ. J. 9.) After Plaintiff made this request, the Court cannot speculate or reasonably infer to whom, if anyone, the request was taken. While Plaintiff says the request was given to Ford, there is no evidence of this. Indeed, the only evidence on this issue suggests the opposite: Wood and Francisco both deny ever *receiving* a request. Wood even denies working that day. Furthermore, it's not clear, nor reasonable to infer, that the "they're" to whom Plaintiff refers in his deposition is Ford.

Despite these evidentiary shortfalls, Plaintiff has proffered enough evidence to create a genuine issue of material fact as to whether Ford had sufficient control to give rise to a duty. Like the defendant's contract in *Aguirre I*, Ford's Safety Guidelines, by which Aristeo was contractually bound, required Aristeo to comply with specific safety regulations, as well as any rules or practices Ford established during the Project. Ford also had the ultimate authority to directly control and fire the employee(s) or the contractor(s), and had promulgated minimum safety information that it required contractors to provide to man-lift operators prior to use.

The contract, of course, does not end the dispute, as both parties argue that it favors their positions. Ford claims that the Safety Guidelines "provide[] that all contractors and subcontractors are required to provide their own safety coordinator for the duration of the project." (Ford's Mem. 7.) Plaintiff points to the numerous provisions of the Guidelines governing safety, including those governing use of the man-lift. (Pl.'s Mem. in Supp. of Summ. J. 7-8.)

In sorting out this issue, the Court finds *Aguirre I* instructive. There, the defendant inspected the scaffolding routinely, walked the jobsite daily, and even worked with the subcontractor to design an alternative scaffolding for the area from which the plaintiff fell. 501 F.3d at 827. Additionally, the defendant, which issued a 125-page safety manual that contained "23 rules specifically pertaining to the erection of scaffolding," could correct any deficiencies in the scaffolding. *Id.* at 827, 830. "[N]otably," the court said, "[the defendant] imposed specific alternative design requirements on the scaffold from which [the plaintiff fell]." *Id.* at 831. Based on these facts, the court found "that [the defendant] retained sufficient control over the safety of scaffolding design and construction to give rise to a duty of reasonable care under section 414." *Id.* The court based its decision on the "extensive precautions taken by [the defendant]," which it found "remarkabl[y] [similar]" to those in *Bokodi*. *Id.* at 831.

In *Bokodi*, the court noted that the defendants (the general contractors and its subsidiaries) "went to great lengths to control the safety standards at the work site." 728 N.E.2d at 735. Among the duties of the general contractor were monitoring subcontractors' weekly safety meetings; instructing subcontractors' employees about the appropriate clothing to be worn; and directing subcontractors when and where to erect lights and barricades. *Id.* The defendants also employed a full-time, site-safety coordinator who would conduct weekly safety meetings. The safety coordinator also would walk through the worksite to ensure compliance with the defendants' safety standards. *Id.* If the defendants witnessed safety violations, they had the authority to halt subcontractors' work. *Id.* Defendants also could prevent the subcontractors from resuming work until "a safety breach had been alleviated to defendants' satisfaction." *Id.* The court found that these measure constituted sufficient control under § 414. *Id.* at 736.

Unlike the defendant in *Aguirre I*, it does not appear that Ford employees were "regularly walk[ing] the site" or "inspect[ing] many of [Ariseto's] [man-lifts]." 501 F.3d at 830. Nor does the evidence show that they worked with Aristeo with regard to its operation of man-lifts. Nevertheless, Ford's supervisor, Steve Knaak, walked the site from time to time and attended to safety violations he saw during his walkthroughs. Also, he had on some occasions personally directed employees to take additional safety measures, and had addressed safety concerns with Aristeo foremen. Plaintiff, in particular, stated that Knaak directed him to stop an unsafe work practice on a ladder.

From these facts it is reasonable to infer that Knaak could and did stop work when he saw a safety violation. Additionally, Wood's testimony that the foreman could go to Ford if they had safety concerns creates an inference that Ford was concerned with safety and had the ability and responsibility to stop unsafe work. *Cf. Martens*, 807 N.E.2d at 491 (distinguishing *Bokodi* on the grounds that, in this case, the defendant's employees "could raise safety concerns to [the plaintiff's foreman] . . . [but] could not stop the work or instruct or supervise the ironworkers"). The Safety Guidelines also support that conclusion, as they specifically reserve to Ford the right to stop (and fire) contractors, subcontractors, and their employees.

Although Ford's level of control is not as high as in *Aguirre I* or *Bokodi*, it is high enough. When combined, Knaak's walkthroughs, his direct influence on worker actions that violated safety provisions, and the Guidelines' specific safety provisions regarding operation of a man-lift, shows that Ford sufficiently affected the means and methods of Aristeo's work. For these reasons the Court finds as a matter of law that Ford had sufficient control over Aristeo's work to give rise to a duty under § 414.

For the same reason the Court also finds that an issue of fact exists as to whether Ford

had actual or constructive notice that Aristeo was performing work dangerously and "had the

opportunity to prevent it" using the control it retained; or that Aristeo performed its work

carelessly and Ford "fail[ed] to exercise reasonable care either to remedy it" or failed to direct

Aristeo to do so. *Aguirre I*, 501 F.3d at 828 (quoting RESTATEMENT (SECOND) OF TORTS § 414

cmt. b). Knaak's visits and directions to perform work on Aristeo's jobsite are enough to create a

genuine issue of material fact on this liability question.

These same facts raise an issue of fact as to proximate cause. To survive a motion for

summary judgment, the plaintiff must put forth evidence showing that the defendant's breach

proximately caused the plaintiff's injury. *Bourgonje v. Machev*, 841 N.E.2d 96, 116 (Ill. App. Ct.

2005). To show proximate cause, the plaintiff must "show that the defendant's negligence was

(1) the actual cause or the cause in fact of his injury, i.e., but for the defendant's conduct, the

accident would not have occurred; and (2) the legal cause of his injury, i.e., the defendant's

conduct was so closely tied to the plaintiff's injury that he should be held legally responsible for

it." *Id.* (quoting *McCraw v. Cegielski*, 680 N.E.2d 394, 396 (Ill. App. Ct. 1996)). Here, Plaintiff

has offered evidence that Ford had personnel doing walkthroughs and conducting safety

inspections. If the jury finds that Ford had knowledge and failed to rectify the problem, the jury

must determine whether that failure proximately caused Plaintiff's injury.


### 2. C-Logic

Plaintiff raises two points to show that C-Logic exercised control over Aristeo. First, he

points to the contract language from Ford's Safety Guidelines: "Safety Coordinators shall have

the authority to stop CONTRACTORS/Subcontractor operations in the event of imminent danger, or repeated non-compliance to safety policies and procedures established for the project."[18] (Pl.'s Resp. to C-Logic's Mot. for Summ. J. 7 (quoting Pl.'s Resp. to Defs.' SOF, Ex. I at § 3.2).) Because C-Logic was bound by this provision, Plaintiff argues that it had authority to stop Plaintiff's work. (Pl.'s Resp. to C-Logic's Mot. for Summ. J. 7.) Second, he argues that C-Logic's actual presence provided the necessary control to give rise to a duty under § 414.

C-Logic, in response, relies on its contract with Aristeo, which states that "C-[L]ogic's work shall not include determining, supervising, or implementing means, methods, techniques or procedures of construction." (Pl.'s Resp. to Defs.' SOF, Ex. S at 2.) It claims that this language, coupled with the testimony of its safety manager, Ann Henkel, that she did not direct or stop construction work, absolve it from any legal duty. (C-Logic's Mem. 6-7.)

The court agrees with C-Logic. Although Aristeo was contractually bound by the Guidelines, that does not mean that hiring C-Logic fulfilled its contractual obligation. Aristeo was free to hire a Safety Coordinator without authority to stop work[19]–and that is exactly what it did when it hired C-Logic. While C-Logic need not actually have stopped work to have sufficient control, it must have the authority to do so. *See Martens*, 807 N.E.2d 480, 491 (finding no supervisory control where the contractor had the ability to raise safety concerns but lacked the

---

[18] There is other contract language that Plaintiff does not cite that explicitly requires the Safety Coordinator to direct personnel associated with the contract. This language requires the same analysis as that given to the language Plaintiff cites. Therefore, the Court does not analyze it separately.

[19] Aristeo's freedom to hire a Safety Coordinator without authority to stop work does not mean that it is free from a breach of contract action. Here, though, Aristeo is not the subject of any of the summary judgment motions.

authority to actually "stop the work or instruct or supervise the" subcontractor's employees); *Moorehead*, 821 N.E.2d at 361 (finding sufficient control where general contractor never directed or stopped work but had the authority to do so, inspected the premises, supervised the subcontractor's work, and was responsible for implementing safety procedures); *see also Bokodi*, 728 N.E.2d at 733 (citing *Weber v. Northern Illinois Gas Co.*, 295 N.E.2d 41 (Ill. App. Ct. 1973), for the proposition that "the defendant had more power than to merely make suggestions or recommendations, and [so] the subcontractor was not entirely free to do the work in his own way").

That requirement reflects the primary focus of the control inquiry: whether C-Logic's safety supervision sufficiently affected the means and methods of Plaintiff's work. *Aguirre I*, 501 F.3d at 830-31. While Henkel testified that she regularly walked the job site, monitored safety, and collected paperwork, she also stated that she did not have the authority to stop or direct work; her authority was limited to making recommendations to Aristeo personnel. That is not enough for control. Additionally, C-Logic's contract with Aristeo provided that C-Logic would train new hires, perform daily supervision and walkthroughs, conduct safety analysis, and make safety recommendations. But that is all. C-Logic could make *only* recommendations; it could not stop Aristeo's work. Indeed, the contract expressly prevented C-Logic from having control over the means and methods of construction. Because the contract and Henkel's testimony establish that C-Logic could not stop Aristeo's work, and because there is no evidence to the contrary, the Court finds that C-Logic did not have control under § 414. Therefore, C-Logic did not owe Plaintiff a duty and is not liable under this theory.

3.    Tri-Tec

Plaintiff argues that Tri-Tec had sufficient control over Aristeo based entirely on Tri-Tec's contract with Durr, which included a safety manual. (Pl.'s Mem in Opp'n to Tri-Tec's Mot. 14.) This contract, Plaintiff, points out, was 110-pages long and contained over 600 provisions. (Pl.'s Mem in Opp'n to Tri-Tec's Mot. 14; Pl.'s Resp. to Defs.' SOF, Ex. U.) This argument, as noted before, is foreclosed by *Aguirre I*, which rejected an approach that relies solely on contract language. In other words, unless the contract specifically requires the contractor to control the means and methods of the subcontractor's work, there has to be evidence that the contractor actually exercised sufficient control over any aspect of the subcontractor's work. Here, no contract required Tri-Tec to direct Aristeo employees. At oral argument, Plaintiff's counsel argued that the contract required inspections–but when the Court pressed him on this topic, he admitted that the contract provided inspections *by the subcontractor* (Aristeo), not Tri-Tec.

Additionally, there is no evidence that Tri-Tec supervised or exercised *any* control over Aristeo. The only evidence presented–from Alberici employees Richardson and Brown–was that Tri-Tec coordinated with *Alberici* to schedule work. But that tells the Court nothing about Tri-Tec's coordination with *Aristeo*. Moreover, there is no evidence that Tri-Tec ran or was involved in any safety training of Aristeo employees. Since the only evidence of control is a contract between Durr and Tri-Tec, Plaintiff has failed to show that Tri-Tec had sufficient control to render it liable under § 414.

4.  Durr

Plaintiff argues that Durr's contract, as well as its actions, give rise to a duty under § 414. Although there is some evidence that Durr supervised, observed, or monitored both Alberici and Aristeo's work, there is no evidence that Durr could sufficiently affect Aristeo's work by, for example, directing the work be done in a different manner.

To support the claim that Durr had this level of control, Plaintiff points to Alberici Manager Brown's testimony that he would approach Durr's project representative, Melvin Melton, when he had questions about how to complete his work. Again, though, Brown is an *Alberici* employee, not an Aristeo employee. His testimony, therefore, does not evidence any relationship Durr may have had with Aristeo. The Court reaches the same conclusion with regard to Brown's testimony that Milton coordinated and scheduled work to be performed by Aristeo and Alberici. This does not show that Durr sufficiently affected the means and methods of Aristeo's work.

Aristeo Superintendent Wood stated that Durr employees would check Aristeo's work for quality and progression "periodically." Although Durr "periodically" checked for hanger "plumbness" and the location of the work, as well as assisted Aristeo interpret the construction drawings, there is no evidence that Durr directed or otherwise controlled how Aristeo performed its work. Without further evidence, the Court cannot reasonably infer that, after an inspection, Durr employees would direct Aristeo employees how to perform their work. According to Aristeo Foreman Francisco, Durr's safety employees had no obligation to interact with Aristeo employees, and neither Plaintiff nor Polweski had seen any Durr employees on the worksite. Plaintiff also stated he never took directions or instructions from Durr. As a result, the Court

- 38 -

finds as a matter of law that Durr did not have sufficient control to give rise to a duty under § 414.

### B.    Premises Liability

Section 414 is not Plaintiff's only ground for his claims against Defendants; he also alleges claims based on premises liability. According to the Seventh Circuit, premises liability in Illinois is determined under the RESTATEMENT (SECOND) OF TORTS § 343. *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1015 (7th Cir. 2000).

> [A]s a general rule, a landowner in Illinois is only [*sic*] liable for harm caused to invitees by a condition on his land if he[]
>
>> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>>
>> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>>
>> (c) fails to exercise reasonable care to protect them against the danger.

*Id.* (quoting *Genaust v. Ill. Power Co.*, 343 N.E.2d 465, 472 (Ill. 1976) (quoting RESTATEMENT (SECOND) OF TORTS § 343))); *see* 740 ILL. COMP. STAT. 130/2.[20] Therefore, to be liable under this theory, the defendant must be "an owner or occupier of any premises." 740 ILL. COMP. STAT. 130/2; *Kotecki*, 776 N.E.2d at 779 ("We agree with [the defendant] that it cannot be liable under premises liability because it is not an owner or occupier as defined by the Act."); *Godee v. Ill.*

---

[20] Illinois no longer distinguishes between invitees and licensees. 740 ILL. COMP. STAT. 130/2 ("The distinction under the common law between invitees and licensees as to the duty owed by an owner or occupier of any premises to such entrants is abolished.").

*Youth Soccer Ass'n*, 764 N.E.2d 591, 594-95 (Ill. App. Ct. 2002) ("For a duty to arise under the law of premises liability, the defendant must possess and control the real property on which the tort occurred. A defendant does not owe a duty to a plaintiff if the defendant does not control or intend to control the land.") (citations omitted).

### 1. Owner or Occupier

Only Tri-Tec and C-Logic[21] dispute their status as owner or occupiers of the premises.[22] In Illinois, the concept of "owner or occupier" has been broadly construed, *McDermott v. Metro. Sanitary Dist.*, 607 N.E.2d 1271, 1285 (Ill. App. Ct. 1992), to mean that "[the defendant] must occupy land with the intent to control it." *Esser v. McIntyre*, 661 N.E.2d 1138, 1143 (Ill. 1996) (citing RESTATEMENT (SECOND) OF TORTS § 328E ("§ 328E") (1964)). Since *Esser* cited the section 328E for this definition, and since the case law in this area is scanty, prior to reviewing those cases, it is helpful to review this section of the Restatement in its entirety.

A possessor of land is

> (a) a person who is in occupation of the land with intent to control it or
>
> (b) a person who has been in occupation of land with intent to control it, if no other person has subsequently occupied it with intent to control it, or

---

[21] Defendant Ford is not analyzed in this Part of the Opinion because the Court already determined it could be liable under § 414. If and when this case goes to a jury, the Court will instruct the jury on the relevant law, including premises liability.

[22] Durr conceded that it was a possessor of the premises in its motion for summary judgment. (Durr's Mem. in Supp. of Mot. for Summ. J. 10 (stating that "a possessor such as Durr is not liable to invitees when invitees should have realized the danger and could have protected themselves against it").)

> (c) a person who is entitled to immediate occupation of the
> land, if no other person is in possession under Clauses (a)
> and (b).

RESTATEMENT (SECOND) OF TORTS § 328E(a)-(c). "Possession," as used in this instance, denotes

"factual possession." RESTATEMENT (SECOND) OF TORTS § 328E cmt. a. That is, the individual or

entity who *in fact* controls the land–rather than, say, the individual or entity who controls the land

by operation of title–is the "possessor." *Id.* ("The important thing in the law of torts is the

possession, and not whether it is or is not rightful as between the possessor and some third

person. Thus a disseisor is a possessor from the moment that his occupation begins, although as

between the disseisor and the true owner he is not legally entitled to possession until his adverse

possession has ripened through lapse of time into ownership.") Thus, where a general contractor

has turned over the property to the owner and only "punch list" work is left, the general

contractor is not an owner or occupier of the land. *Kotecki*, 776 N.E.2d at 779. Mere permission

to use land–without the authority to control it–likewise is insufficient. *Collins v. Mid-Am. Bag

Co.*, 535 N.E.2d 48, 49 (Ill. App. Ct. 1989) (finding that the organizer of a softball game was not

an owner or occupier because he had permission to use the land for a game only).

Beyond these few examples, however, Illinois cases are sparse. Those courts choosing to

examine a general contractor's liability under this section have not explicitly ruled on the

contractor's status as an owner or possessor. *Joyce v. Mastri*, 861 N.E.2d 1102, 1114

(Ill. App. Ct. 2007); *Cochran*, 832 N.E.2d at 360; *Downs v. Steel and Craft Builders, Inc.*, 831

N.E.2d 92, 102-03 (Ill. App. Ct. 2005).[23]

---

[23] The Court also notes that the Restatement speaks directly to the issue of possession by
a general contractor:

(continued...)

With a shortage of case law, the next logical place to look for clues is the original source of the law. Since possession is essentially a question of control, the relevant issue is how much control must one have to be an owner or occupier. Section 414 liability is based on the control of one contractor over any part of the subcontractor's *work. Aguirre I*, 501 F.3d at 829. Premises liability, on the other hand, is based on ability to control (and discover dangerous conditions on) *the premises*. RESTATEMENT (SECOND) OF TORTS § 343 (describing liability for conditions on the owner or occupier's land). That difference–between control of any part of the work and control over the premises–dictates the relevant standard of control. Premises liability requires a *broader* sense of control than liability under § 414–that is, control not just over the subcontractor's work, but control of the entire premises. Thus, the plaintiff is required to make a stronger and more general showing of control to demonstrate premises liability than for liability

---

[23](...continued)

> An independent contractor or servant to whom the owner or possessor of land turns over the entire charge of the land is subject to the same liability for harm caused to others, upon or outside of the land, by his failure to exercise reasonable care to maintain the land in safe repair as though he were the possessor of the land.

RESTATEMENT (SECOND) OF TORTS § 387. Thus, the owner must turn over "the entire charge of the land" for an independent contractor to be liable "as though he were the possessor of the land." *Id.* This implies that, to be a "possessor of the land" under this section, one needs to have control over "the entire charge of the land." Additionally, use of "the"–instead of "a"–in "the possessor" implies that only one entity can possess the land at any given time.

As comment *a* explains, liability under § 387 cannot arise where the independent contractor's duty is merely to make repairs, or to inspect and make repairs that he deems necessary. RESTATEMENT (SECOND) OF TORTS § 387 cmt. a ("It is not enough to create liability under the rule stated in this Section that he has undertaken to make specific repairs, or even to inspect the land or building and from time to time make such repairs as he should discover to be necessary.") Given that § 387 holds liable the contractor who was given the "entire charge" of the land, it provides a different standard of liability than § 343, which holds liable the owner or occupier. The point here is that section § 343 may pick up where § 387 leaves off.

under section 414. Perhaps a more concrete formulation would be that premises liability means *ultimate control of the premises.*[24]

Plaintiff's arguments that Defendants are owners or occupiers of the premises rely mostly on the assumption that the cases he cites–those that treated contractors as owners or occupiers–correctly analyzed the owner-or-occupier issue. (Pl.'s Mot. in Resp. to Tri-Tec's Mot. for Summ. J. 19 (citing *Joyce*, 861 N.E.2d at, 1114; *Cochran*, 832 N.E.2d at 360; *Downs*, 831 N.E.2d at 102-03).) But, as noted above, these courts never expressly ruled whether and why the contractor was an owner or occupier, as that issue was not contested in those cases. Here, however, Tri-Tec and C-Logic argue that they are not owners or occupiers, and so the Court must determine this issue.

Plaintiff makes two short arguments–one as to Tri-Tec and the other as to C-Logic. With regard to Tri-Tec, Plaintiff argues that "Tri-Tec was in occupation of the land with not only the intent to control it, but also a contractual duty to control it. Therefore, under the plain language of [s]ection 328E, Tri-Tec was a possessor the land . . . ." (Pl.'s Resp. to Tri-Tec's Mot. for Summ. J. 19).

With regard to C-Logic, Plaintiff makes the following argument:

> C-Logic was contractually obligated to execute safety management services including 'daily safety supervision and walkthrough' and 'jobsite analysis.' It would have been impossible for C-Logic to enforce its contractual provisions unless it had the ability . . . both . . . [to possess] . . . the property and [to] exercise control over the project.

---

[24] Plaintiff never defines what constitute "the premises" for purposes of this inquiry–the area in which Aristeo worked, or the entire Ford Plant. That point is mooted, however, by the Court's finding that all Defendant's do not qualify as owners or occupiers.

(Pl.'s Resp. to C-Logic's Mot. for Summ. J. 10.) The Court understands that most cases have ignored this issue in the general contractor context; but that does not excuse Plaintiff's lack of argument here because Tri-Tec and C-Logic are contesting the issue.

Having reviewed Plaintiff's owner-or-occupier arguments, the Court finds that they fall short. Because the premises-liability standard is higher than that required for control under § 414, the mere fact that contracts exist between the general contractor and Ford, or between C-Logic and Aristeo, does not create the requisite control. Indeed, the Court already found that the Tri-Tec's contract with Durr did not give it control to sufficiently affect the means and methods of any aspect of Plaintiff's work. Despite this lack of control, it is possible, though improbable, that Tri-Tec still had control over the premises. Unfortunately for Plaintiff, there is no evidence that Tri-Tec had such control. Therefore, in this case, the contract alone is not enough.

The same analysis applies a fortiori to C-Logic. Its contract expressly disclaimed any ability to control Aristeo's work. Its contractual power extended only to making safety recommendations. There is no evidence that it controlled the premises or intended to do so. For those reasons, the Court finds that neither Tri-Tec nor C-Logic is an "owner or occupier" of the premises. Therefore, they cannot be held liable under § 343.

### 2. Notice

Since the Court found Tri-Tec and C-Logic were not owners and occupiers of the premises, it has only one Defendant for which a notice analysis is relevant: Durr. Despite not needing to discuss the facts relating notice for C-Logic and Tri-Tec, the Court makes two quick notes. First, Tri-Tec did not have notice of the dangerous condition for many of the same reasons

the Court explains Durr lacked notice. Second, assuming C-Logic was an owner or occupier, the Court finds that a genuine issue of material fact exists as to whether it had notice of the dangerous condition. Moving to the merits: Plaintiff argues that Durr knew or should have known that the overhead conveyors and items were in Aristeo's work area.[25] (Pl.'s Resp. to Durr's Mot. for Summ. J. 11-12.)

As noted above, an owner or occupier owes the plaintiff a duty of care where he has knowledge of a dangerous condition on the premises. *Wiegman v. Hitch-Inn Post of Libertyville, Inc.*, 721 N.E.2d 614, 625 (Ill. App. Ct. 1999). Knowledge can be actual or constructive. *Id.* (stating that "liability may be imposed if it appears the proprietor or [its] servant knew of its presence, or . . . the substance was there a sufficient length of time so that in the exercise of ordinary care its presence should have been discovered").

Since there is no evidence of actual knowledge, the Court looks to the issue of constructive knowledge. The law presumes the possessor has "constructive notice of all conditions discoverable by reasonable inspection of the premises." *Lombardo v. Reliance Elevator Co.*, 733 N.E.2d 874, 881-82 (Ill. App. Ct. 2000). The plaintiff can show constructive knowledge by "establishing that the condition persisted long enough that the defendant should have discovered the condition through the exercise of reasonable care." *Id.* at 882; *Richardson v. Bond Drug Co. of Ill.*, 901 N.E.2d 973, 976 (Ill. App. Ct. 2009) ("Nevertheless, even where there is no showing as to how the substance got on the floor, liability may be imposed if it appears that

---

[25] The Court laments the parties' lack of briefing on the issue of actual or constructive knowledge. Instead of citing case law to support their respective positions, each party argues based on facts alone. Without reference to some legal standard, however, these facts tell the Court very little.

the owner or his employees knew of its presence, or the substance was there a length of time so that, in the exercise of ordinary care, its presence should have been discovered.").

There is some evidence showing Durr had, at one time, supervised both Alberici and Aristeo. This came in the form of Brown's testimony that he saw Melvin Milton, Durr's project manager, observing Aristeo and Alberici employees. The evidence also shows Brown was testifying about a period of time when Alberici and Aristeo worked in the same area of the Plant. During the time that Plaintiff was injured, however, Alberici was working in a different area. Thus, even if Durr had observed Aristeo at one time, there is no evidence it was doing so after Alberici moved from the area in which Aristeo worked. Additionally, as mentioned above, Aristeo Superintendent Wood testified that Durr employees would periodically check for quality and progression.

This testimony, however, does not "[establish] that the condition persisted long enough that the defendant should have discovered the condition through the exercise of reasonable care." *Lombardo*, 733 N.E.2d at 881-82. There is almost no evidence establishing how long the dangerous condition existed. The evidence Plaintiff presented showed that the materials blocked the aisle, he asked Aristeo to move them, and they were never moved. How long this took was not disclosed, though it appears to have occurred within a short period of time. Additionally, Wood's testimony established that Durr came by Aristeo's worksite "periodically" to check for quality. Without evidence regarding the time the condition existed or the frequency of inspections, there is not enough evidence to create an issue of fact as to Durr's constructive knowledge; i.e., whether it should have discovered it. For that reason, the Court finds that Durr did not have notice of the dangerous condition.

Plaintiff, however, has one last argument. He claims that the law does not require Durr to have notice of the dangerous condition because Durr created the dangerous condition. (Pl.'s Resp. to Durr's Mot. for Summ. J. 12-13 (citing *Reed v. Wal-Mart Stores*, 700 N.E.2d 212 (Ill. App. Ct. 1998)). While Plaintiff is correct to cite *Reed* for this proposition, he is wrong that this rule applies here.

*Reed* concerned a woman who was injured when she stepped on a rusty nail protruding from a board while looking around the garden section of a Wal-Mart. 700 N.E.2d at 213. The Court held that "a plaintiff does not need to prove actual or constructive notice when she can show the substance was placed on the premises through the defendant's negligence." *Id.* at 214 (citing *Wind v. Hy-Vee Food Stores, Inc.*, 650 N.E.2d 258, 262 (Ill. App. Ct. 1995). This requires the plaintiff to show "that the object is related to the defendant's business *and* offers some slight evidence that the defendant or his servants, rather than the customer, placed the substance on the floor." *Id.* (citing *Wind*, 650 N.E.2d at 262 (emphasis in original)).[26]

*Reed* is still good law–but Plaintiff doesn't have the facts he needs to fall within *Reed*'s ambit. Sure, there's evidence that some entity other than Aristeo placed the cart in its location, and that the conveyors were running. The problem is that there is almost no testimony about who was responsible for the cart or the conveyor. The only testimony, in fact, came from Plaintiff, who stated that the cart belonged to Ford. At best, the Court can reasonably infer that the cart belonged to Ford and that Ford placed it there. But Ford is not the subject of this inquiry, Durr

---

[26] The Court notes that the *Reed* test actually is just another method of proving constructive knowledge. In other words, where the plaintiff shows "that the object is related to the defendant's business and offers some slight evidence that the defendant or his servants, rather than the customer, placed the substance on the floor," courts *impute* to the defendant knowledge of the dangerous condition.

is–and there is no evidence of any kind that Durr placed the cart or other materials in the area where they were found. Nor is there evidence that Durr caused those items to be in those locations. Without any evidence that the cart was in the gangway, or that the conveyors were obstructing the worksite, as a result of Durr's negligence, no issue of fact exists as to Durr's liability.

### C.     Voluntary Undertaking

Plaintiff also alleges that C-Logic and Tri-Tec are liable under section 324A of the RESTATEMENT (SECOND) OF TORTS (1965), which states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
>> (a) his failure to exercise reasonable care increases the risk of such harm, or
>>
>> (b) he has undertaken to perform a duty owed by the other to the third person, or
>>
>> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Specifically, Plaintiff argues that § 324A(a) applies because Tri-Tec's "failure to adhere to its contractual duties to control safety at the worksite . . . increas[ed] the risk of harm to a worker like Plaintiff." (Pl.'s Resp. to Tri-Tec's Mot. Summ. J. 9.) Plaintiff cites and discusses, *Nelson v. Union Wire Rope Corp.*, 199 N.E.2d 769, 773 (Ill. 1964), to support his view that the Restatement applies here. (*Id.* at 8-9.) Although "*Nelson* . . . is no longer sound on its own facts,"

*Factory Mut. Ins. Co. v. Bobst Group USA, Inc.*, 392 F.3d 922, 923 n.† (7th Cir. 2004), Illinois

courts still use § 324A to assess liability for voluntary undertaking. *E.g.*, *Pippin v. Chicago*

*Housing Authority*, 399 N.E.2d 596, 600 (Ill. 1979). Whether a duty has arisen because of a

voluntary undertaking is a question of law, though "a dispute of material fact affecting the

existence of an undertaking of a duty" makes "summary judgment improper." *Bourgonje*, 841

N.E.2d at 106; *see Nelson* at 778 (holding that "an enforceable duty to plaintiffs did arise as the

result of defendant's gratuitous undertaking in this case").

    Additionally, although section 324A could apply here, it is directed at situations

involving voluntary undertaking designed to protect *third persons*. Here, however, both Tri-Tec

and C-Logic's alleged undertaking was for the benefit of Aristeo and its workers. Therefore, the

applicable section of the Restatement is § 323, which "addresses when the injured party is the

person for whom the voluntary undertaking was made." *Bourgonje*, 841 N.E.2d at 107.

Section 323 states:

> One who undertakes, gratuitously or for consideration, to render
> services to another which he should recognize as necessary for the
> protection of the other's person or things, is subject to liability to the
> other for physical harm resulting from his failure to exercise
> reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such
> > harm, or
> >
> > (b) the harm is suffered because of the other's reliance upon
> > the undertaking.

RESTATEMENT (SECOND) OF TORTS § 323 (1965). Since both sections lay out essentially the same

cause of action, the Court construes Plaintiff's argument as one under § 323.

Under § 323, a duty can arise for "nonfeasance" (breaking a promise to undertake certain performances) or "misfeasance" (carelessly performed undertakings). *Day v. Menard,* Inc., 899 N.E.2d 501, 504 (Ill. App. Ct. 2008) (citing *Bourgonje*, 841 N.E.2d at 107). Where the plaintiff alleges nonfeasance, she must show her "reliance on the defendant's promise" to undertake a duty. *Bourgonje*, 841 N.E.2d at 108. Reliance, of course, must be reasonable, and it is reasonable "where there is a deceptive appearance that performance had been made, or where a representation of performance has been communicated to plaintiff by defendant, or where plaintiff is otherwise prevented from obtaining knowledge or substitute performance of the undertaking." *Id.* at 114 (quoting *Chisolm v. Stephens*, 365 N.E.2d 80, 87 (Ill. 1977)). Additionally, "to justify reliance, [a] plaintiff must be unaware of the actual circumstances and not equally capable of determining such facts." *Id.* (quoting *Chisolm*, 365 N.E.2d at 87) (alteration in original).

If, however, the plaintiff alleges misfeasance, she "may recover either if [s]he relied on the volunteer's performance, *or* if the volunteer's performance actually increased the risk of harm to the plaintiff." *Id.* at 108 (emphasis added). A duty arising from either nonfeasance or misfeasance can be based on a contract. *Id.* at 110-12 (adopting this view in part because contract obligations are triggered with *any* breach whereas tort liability is triggered by negligent performance of the contract).

Tri-Tec and C-Logic argue that Plaintiff's claim fails here because he did not show that he relied on the "promises" of either Tri-Tec or C-Logic. (Tri-Tec's Reply in Supp. of Mot. for Summ. J. 7 (citing *Mann v. Producer's Chem. Co.*, 827 N.E.2d 883, 888-89 (Ill. App. Ct. 2005) (requiring the plaintiff to prove reliance to show proximate cause)); C-Logic's Reply in Supp. of

Mot. for Summ. J. 12-13.) Each makes a slightly different argument based on this principle. Tri-Tec argues that Plaintiff presented no evidence that he relied on any alleged undertaking. (Tri-Tec's Reply in Supp. of Mot. for Summ. J. 7.) C-Logic argues that Plaintiff "cannot justify reliance because he was well aware of the actual circumstances under which he used a man-lift to erect a steel beam." (C-Logic's Reply in Supp. of Mot. for Summ. J. 12-13.)

Assuming the contracts of Tri-Tec and C-Logic constitute an undertaking,[27] the Court agrees that Plaintiff cannot show reliance on these contracts to bring a claim for nonfeasance. C-Logic points out that Plaintiff was aware that the man-lift was not supposed to be used to hoist steel beams, and he was aware of all the facts relating thereto. Moreover, Tri-Tec did not deceptively appear to perform a duty, represent to O'Neil that performance had been made, or prevent Plaintiff from obtaining knowledge of substitute performance of the undertaking. Additionally, Plaintiff has put forward no evidence showing reliance of any kind. For that reason, the Court rejects his claim based on nonfeasance.

But that's not the end of the § 323 inquiry. Plaintiff also bases a § 323 claim on misfeasance under section (a), which does not require proof of reliance.[28] As to Tri-Tec, there is no evidence that it ever performed any duty whatsoever. The only evidence of its dealings with any entity came from Richardson, who worked as Alberici's superintendent. As noted before, this

---

[27] Tri-Tec and C-Logic do not contest that they engaged in a voluntary undertaking, so they concede this point on summary judgment.

[28] Regrettably, neither party informed the Court of the distinction between misfeasance and nonfeasance, §§ 323(a) and (b) (or even §§ 324A(a), (b), and (c)), or how any of these principles or provisions apply to this case. Additionally, neither C-Logic nor Tri-Tec addressed the argument of misfeasance; instead they framed their arguments in terms of reliance, which is a required element only of nonfeasance. Misfeasance, as the Court has discussed, can be shown by demonstrating reliance or an increased risk of harm.

is not evidence that Tri-Tec had any dealings with *Aristeo*. Therefore, Tri-Tec is not liable under either a § 323 misfeasance or nonfeasance theory.

As to C-Logic, however, Plaintiff has presented evidence that C-Logic's safety manager, Ann Henkel, walked around and observed unsafe conditions. She also made recommendations to Aristeo when she discovered issues that raised safety concerns. Because of C-Logic's misplaced reliance argument, it fails to address this point adequately. The question here is whether C-Logic's "performance actually increased the risk of harm to the plaintiff." *Bourgonje*, 841 N.E.2d at 107. To that point, it is reasonable to infer that, C-Logic (and Henkel), by negligently supervising the worksite and making safety recommendations, actually increased the risk of harm to Plaintiff.

Additionally, there are facts sufficient to establish proximate cause. Here, C-Logic (and therefore Henkel) was contractually bound to supervise the jobsite for safety purposes, and Henkel testified that she did so. If she performed this duty negligently, it is reasonable to infer that her failure to observe the blocked area caused Plaintiff to use the man-lift. As a result of not making a recommendation that this practice be halted, the Court can reasonably infer Plaintiff injured himself using a man-lift to hoist a beam. Because there exists a genuine issue of material fact as to whether C-Logic had a duty under § 323, the question of proximate cause is one for the jury.[29] *Buerkett*, 893 N.E.2d at 714 ("While proximate cause is generally a question of fact, a

___

[29] Both Tri-Tec and C-Logic seem to argue, erroneously, that "reliance" always is required to prove liability on a §§ 323 or 343A claim. In particular, Tri-Tec contends that reliance is required as part of the proximate causation analysis on a misfeasance claim under § 323(a). That is incorrect. Part of this confusion stems from the Illinois Appellate Court's opinions in *Mann*, 827 N.E.2d at 888, and *Rice v. White*, 874 N.E.2d 132, 148 (Ill. App. Ct. 2007). *Mann* involved a claim brought under § 343A(c), which states "reliance" as an element of the claim. 827 N.E.2d at
(continued...)

court may determine a lack of proximate cause as a matter of law where the facts fail to establish

both cause in fact and legal cause.")


### D.    Claims Against Alberici

Plaintiff's claim against Alberici is for common-law negligence. Alberici initially argues

that Plaintiff never pled sufficient facts to put it on notice of a common-law negligence claim.

Alberici's argument centers on Plaintiff's complaint, which states:

> Notwithstanding their duty, at said time and place, the Defendants,
> and each of them, by and through their agents, servants and
> employees, were then and there guilty of one or more of the following
> careless and negligent acts and/or omissions:
>
> (d) Failed to warn the Plaintiff of the dangerous conditions then and
> there existing, when the Defendants knew, or in the exercise of
> ordinary care should have known, that said warning was necessary to
> prevent injury to the Plaintiff.
>
> (e) Failed to provide adequate safeguards to prevent the Plaintiff from
> injury while lawfully upon said premises.

---

[29](...continued)
888; RESTATEMENT (SECOND) OF TORTS § 324A(c) ("the harm is suffered because of *reliance* of
the other or the third person upon the undertaking") (emphasis added); *see Rowe v. State Bank of
Lombard*, 531 N.E.2d 1358, 1365 (Ill. 1988) (noting that the rationale for RESTATEMENT
(SECOND) OF TORTS § 324A(c), was based on reliance (quoting *Pippin*, 399 N.E.2d at 600)). The
*Rice* court cited *Mann* to hold that, "[u]nder a voluntary undertaking theory, to establish
proximate cause of the injury, the cause-in-fact component requires a showing that a plaintiff
relied on the defendant's conduct." *Rice*, 874 N.E.2d at 148. That is a misreading of the law.
*Bourgonje*, 841 N.E.2d at 108, correctly dissected the two causes of action under §323, only one
of which (§ 323(b)) requires reliance as an element of the claim. *Compare* RESTATEMENT
(SECOND) OF TORTS § 323(a) *with* RESTATEMENT (SECOND) OF TORTS § 323(b). At least one
court has recently picked up on this distinction. *See Buerkett v. Ill. Power Co.*, 893 N.E.2d 702,
714 (Ill. App. Ct. 2008) (citing *Bourgonje*, 841 N.E.2d at 107).

- 53 -

(Pl.'s Fourth Am. Compl. ¶ 6(d)-(e).) At oral argument, Plaintiff's attorney argued that paragraphs 6(d) and (e) specifically include a claim for common law negligence. Reviewing these sections, the Court finds that Plaintiff's Complaint was sufficient to put Alberici on notice of a common-law negligence claim.

Moving to the claim itself, the Court notes that Plaintiff's claim still requires him to prove the traditional elements of negligence: duty, breach, causation, and injury. The threshold question, which is one of law, is whether Alberici owed Plaintiff a duty. *Preze v. Borden Chem., Inc.*, 782 N.E.2d 710, 714 (Ill. App. Ct. 2002). Typically, the court determines the existence of a duty by considering the following: (1) foreseeability; (2) likelihood of injury; (3) magnitude of the burden on the defendant to guard against the injury; and (4) consequences of placing a burden on the defendant.[30] *LaFever v. Kemlite Co.*, 706 N.E.2d 441, 446 (Ill. 1998).

Plaintiff cites *Melchers v. Total Electric Construction*, 723 N.E.2d 815 (Ill. App. Ct. 1999), to argue that "one subcontractor has a duty, based on direct negligence principles, to exercise reasonable care to protect employees of another subcontractor from injury." (Pl.'s Resp. to Alberici's Mot. for Summ. J. 3 (citing *Melchers*, 723 N.E.2d at 820).) That is a misstatement of the law. *Melchers* held that a duty arose where one subcontractor used another's equipment or apparatuses–it did not hold that subcontractors generally and in all cases owe each other a duty.[31] 723 N.E.2d at 819 ("We hold . . . that [the subcontractor] had a duty to exercise reasonable care

---

[30]As will be shown below, the case law in this area obviates the need to consider these factors in this instance.

[31] Alberici aptly notes this, but fails to provide any contrary authority, instead relying on the four factors courts consider to determine the existence of a duty. (Alberici's Reply in Supp. of Mot. for Summ. J. 7-8.)

to protect plaintiff from injury caused by its equipment or apparatus."). *Melchers* did state, however, that a duty arises where two subcontractors are involved in the "same work." 723 N.E.2d at 818 (stating that "[o]ne engaged in the construction of a building owes to another not in his employ, engaged in the same work and exercising due care for his own safety, the duty of using reasonable care to avoid injuring him" (quoting *Ziraldo v. W.J. Lynch Co.*, 365 Ill. 197, 201, 6 N.E.2d 125, 128 (1936)); *see Preze*, 782 N.E.2d at 717.

Applying common-law principles and the *Melchers* case, the Seventh Circuit has held that no duty exists between contractors where something other than the defendant's equipment causes the plaintiff's injury and the defendant lacks control over the construction site. *Binz v. Brandt Constr. Co.*, 301 F.3d 529, 534 (7th Cir. 2002). The Illinois Appellate Court also has distinguished *Melchers*, stating that the duty in that case was based on the "extensive interaction" between the subcontractors. *Preze*, 782 N.E.2d at 717. Even though the defendant-contractor in *Preze* allowed the plaintiff to use its ladder, the court noted that the contractors were hired separately to perform different work and did not work together or in the same area. *Id.*

In this case, there is no evidence that Alberici's equipment caused Plaintiff's injury or that Alberici controlled the construction site where Plaintiff was injured. While Plaintiff argues that the toolboxes and the cart caused Plaintiff to engage in dangerous activity, he has not offered any evidence that these items belonged to Alberici, or that Alberici had control over them. As previously noted, Plaintiff testified the cart obstructing the area belonged to Ford–and Plaintiff failed to proffer any other evidence showing who owned the cart or the other materials in the aisle. Although Alberici had, at one time, worked in the area where Plaintiff was injured, evidence showed that Alberici was not scheduled to work in that area on the day Plaintiff was

injured. Plaintiff also failed to present any evidence that Alberici was working there at that time. Finally, the Court notes that Alberici was engaged in work (installing a conveyor system) different from Aristeo (installing steel beams). Based on this analysis, the Court finds that Alberici did not owe Plaintiff a duty. Therefore, Alberici is not liable under common-law negligence theory.

## IV.  Conclusion

Based on the forgoing, the Court orders the following:

    1.  Ford's Motion for Summary Judgment is denied.

    2. C-Logic's Motion for Summary Judgment is denied.

    3. Tri-Tec's Motion for Summary Judgment is granted.

    4. Durr's Motion for Summary Judgment is granted.

    5. Alberici's Motion for Summary Judgment is granted.

    6. The Court's September 22, 2009, Order denying Plaintiff's Motion for Leave is vacated, and the Plaintiff's Motion for Leave (Dckt. 252) is granted.

    7. Defendants' Motion to Strike (Dckt. 246) is denied as moot.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: December 9, 2009.